## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

JOY ELAINE STEWART,

      Plaintiff,

v.                                                     CIVIL ACTION NO. 2:19-cv-00731

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.


### <u>PROPOSED FINDINGS & RECOMMENDATION</u>

Plaintiff Joy Elaine Stewart ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on October 11, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 16) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 17).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 60 years old at the time of her alleged disability onset date and 62 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 197.)[1] She is a high school graduate. (*Id.* at 201.) She has been employed as an office assistant or office manager in various industries. (*Id.*) Claimant alleges that she became disabled on May 8, 2016, due to "Epstein Barr Virus causing chronic fatigue, memory loss"; "worsening Chronic Fatigue, can't function due to tiredness"; depression and anxiety; arthritis; "Thyroidism"; sleeplessness, allergies, and migraine headaches. (*Id.* at 197, 200.)

Claimant protectively filed her application for benefits on May 26, 2016. (*Id.* at 179–86.) Her claim was initially denied on August 17, 2016, and again upon reconsideration on November 4, 2016. (*Id.* at 111–15, 117–19.) Thereafter, on January 5, 2017, Claimant filed a written request for hearing. (*Id.* at 120–21.) An administrative hearing was held before an ALJ on July 11, 2018, in Beckley, West Virginia. (*Id.* at 40–70.) On October 22, 2018, the ALJ rendered an unfavorable decision. (*Id.* at 21–39.) Claimant then sought review of the ALJ's decision by the Appeals Council on October 30, 2018. (*Id.* at 176–78.) The Appeals Council denied Claimant's request for review on August 12, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 15.

Claimant timely brought the present action on October 9, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 14) and a transcript of the administrative proceedings (ECF No. 15). Claimant subsequently filed her Brief in Support of Judgment on the Pleadings (ECF No. 16), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 17). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Mental Health Treatment

On October 1, 2014, Claimant presented to her primary care physician, Dr. Jessica Murphy, D.O. ("Dr. Murphy"), complaining of "Emotional Stress." (*Id.* at 372.) She reported feeling anxious, depressed, and overwhelmed and that she could not "stop crying" and had "difficulty coping." (*Id.*) She rated her symptoms as severe and stated that they had recurred daily for four to six months. (*Id.*) Claimant reported difficulty concentrating, anhedonia, and disturbed sleep. (*Id.*) Dr. Murphy diagnosed Claimant with anxiety and directed her to continue her prescribed medication, practice yoga or meditation, and exercise. (*Id.* at 373–74.)

Claimant returned to Dr. Murphy on April 13, 2015, and complained of symptoms of depression, including sadness, irritability, achiness, moodiness, and fatigue. (*Id.* at 365.) However, she told Dr. Murphy that her "medicine is helping and [she] is taking it every day." (*Id.*) Dr. Murphy observed that Claimant was fully oriented and her remote

and recent memory was within normal limits. (*Id.* at 367.) She described Claimant's mood as "sadness, anxiety, worry," but she observed that her affect was appropriate. (*Id.*) Dr. Murphy changed Claimant's medication and recommended regular exercise and a nutritious diet. (*Id.*) A couple weeks later, on April 29, 2015, Claimant again presented to Dr. Murphy for her annual "health maintenance visit." (*Id.* at 359.) She "denie[d] any symptoms or concerns" and "describe[d] [her] overall health as good," but she reported depression, excessive stress, and nervousness. (*Id.* at 359–60.) Dr. Murphy observed that she was fully oriented, her remote and recent memory was within normal limits, and her "mood is neutral and the affect appropriate." (*Id.* at 362.) Her findings were the same at appointments on August 14, 2015, November 13, 2015, and April 12, 2016. (*Id.* at 339, 348, 353.)

Claimant returned to Dr. Murphy on October 3, 2016, and reported "tired[ness], fatigue, [and] no desire to do things." (*Id.* at 464.) She stated that she "has to push herself to go into public and to work" and that she "usually is sleeping when at home." (*Id.*) Claimant related behavioral and mood changes, excessive stress, depression, and nervousness. (*Id.* at 466.) Dr. Murphy observed that Claimant was fully oriented but described her mood as "sadness, worry, detachment, anxiety" and her affect as "inappropriate." (*Id.* at 467.) Claimant was directed to continue her medication regimen and to "[s]tay active and try to engage in some daily activities." (*Id.* at 468.)

On December 16, 2016, Claimant presented to an outpatient behavioral health clinic on self-referral. (*Id.* at 399.) She reported using an anti-depressant for the previous eight months but still felt irritable and "crie[d] a lot." (*Id.*) She stated that "she worked for approximately one year and had a 'mini breakdown' and quit work." (*Id.*) A mental status examination was normal aside from depressed mood. (*Id.* at 401.) Claimant was

diagnosed with anxiety disorder and bipolar disorder. (*Id.* at 403.) Her medications were modified, and she was referred to therapy. (*Id.* at 402–03.) She returned to the clinic for a follow-up appointment on December 23, 2016, and reported "[n]o problems with [her] cur[rent] med[ication] regimen." (*Id.* at 404.) A mental status examination was normal aside from anxious mood. (*Id.* at 405–06.) Claimant was instructed to continue her medications and was again referred to therapy. (*Id.* at 406–07.)

Claimant began therapy that day and "reported no changes since the date of her intake." (*Id.* at 420.) She stated that "[s]he continues to have ongoing problems related to chronic depression and anxiety mood [sic]." (*Id.*) A mental status examination was normal aside from "Anxious/Depressed" mood and "congruent" affect. (*Id.*) Claimant "demonstrated good participation" during the session and agreed "to attend weekly sessions at this time." (*Id.*) She returned to therapy one week later, on December 30, 2016, and "presented with depressed mood" and "reported having suicidal thoughts about one week ago." (*Id.* at 423.) A mental status examination was normal aside from depressed, sad mood and "down" affect. (*Id.* at 423–24.) Claimant "denie[d] any current [suicidal or homicidal] ideations" or any plan or intent. (*Id.* at 424.) It was noted that "[s]he verbally contracted for safety." (*Id.* at 423.) Claimant was directed to return to therapy in one week. (*Id.* at 424.)

At her next therapy appointment on January 3, 2017, Claimant "reported ongoing depression" but stated that "she feels that her medication may be starting to take effect" and that "[s]he has been making efforts to eliminate unnecessary stress." (*Id.* at 426.) A mental status examination was normal aside from depressed mood and affect and "[s]ome issues reported to recent memory." (*Id.* at 426.) Claimant returned one week later, on January 10, 2017, and "reported a recent family conflict which she says has triggered

emotional distress." (*Id*. at 429.) A mental status examination was normal aside from depressed mood and affect. (*Id*. at 429–30.)

In the meantime, Claimant presented to her primary care physician, Dr. Murphy, on January 6, 2017, complaining of nervousness, "worry that something bad is about to happen," and difficulty sleeping. (*Id*. at 471.) She reported that she was "taking [her] medication as prescribed and it is helping," but one medication made her unable to "sleep at all," so she switched back to her old medication. (*Id*.) Dr. Murphy observed that Claimant was fully oriented, her remote and recent memory was within normal limits, and her "mood is neutral and the affect appropriate." (*Id*. at 473.) Dr. Murphy made changes to Claimant's medication regimen and encouraged her to "[s]tay active and try to engage in some daily activities." (*Id*. at 474.)

On January 16, 2017, Claimant reported to her provider at the behavioral health clinic that she and Dr. Murphy were concerned that her medication "keeps her awake." (*Id*. at 408.) She also stated that she "'had a panic attack' on her way" to her appointment. (*Id*.) A mental status examination was normal except for anxious mood. (*Id*. at 409–10.) Claimant's medication regimen was modified. (*Id*. at 410–11.) At her therapy appointment on January 27, 2017, Claimant "reported she has been feeling better with her depression." (*Id*. at 432.) A mental status examination was normal except for anxious mood and "tense, edgy" affect. (*Id*. at 432–33.)

At an appointment with Dr. Murphy on May 22, 2017, Claimant reported "chronic fatigue and poor functionins [sic]" caused by her anxiety disorder. (*Id*. at 481.) However, she again stated that she was "taking [her] medication as prescribed and it is helping." (*Id*.) Dr. Murphy observed that Claimant was fully oriented, her remote and recent memory was within normal limits, and her "mood is neutral and the affect appropriate."

(*Id.* at 483.) She directed Claimant to continue her medication regimen and "[s]tay active and try to engage in some daily activities." (*Id.* at 484.) When Claimant returned to Dr. Murphy three months later, on August 22, 2017, she reported that her medication "is not helping." (*Id.* at 487.) However, Dr. Murphy observed that Claimant was fully oriented, her remote and recent memory was within normal limits, and her "mood is neutral and the affect appropriate." (*Id.* at 489.) Dr. Murphy modified Claimant's medication. (*Id.*)

　　*2. Consultative Psychological Examination: Larry J. Legg, M.A.*

　　On August 8, 2016, licensed psychologist Larry J. Legg, M.A. ("Mr. Legg") performed a consultative psychological examination of Claimant. (*Id.* at 327–32.) Mr. Legg observed that Claimant arrived on time for the examination and drove herself. (*Id.* at 327.) He further observed that "[s]he was clean and suitably dressed" and was "cooperative," but "[h]er attitude was serious." (*Id.*) Claimant told Mr. Legg that she received treatment for her mental impairments from her primary care physician, Dr. Murphy, and that she had used psychotropic medications for "approximately 20 years." (*Id.* at 328.) She reported "a depressed mood for most of the day nearly every day" and "feel[ing] sad, empty, and hopeless." (*Id.*) She also reported "a loss of interest or pleasure in most activities, insomnia, fatigue, and feelings of worthlessness" but "no recurrent thoughts of death or suicidal ideation." (*Id.*) In addition, Claimant reported "a diminished ability to think and concentrate" and "indecisiveness nearly every day." (*Id.*) She explained that she suffered from memory loss that caused her to forget "names, dates, and details." (*Id.*) Claimant further reported "excessive amounts of anxiety, worry, and apprehension most days that she finds difficult to control" and symptoms of "restlessness, fatigue, poor concentration, irritability, and sleep disturbance." (*Id.*) However, she stated

that she had never received outpatient mental health treatment or been hospitalized "for any psychiatric or psychological reasons." (*Id.* at 329.)

Upon mental status examination, Mr. Legg observed that Claimant "was appropriately dressed and groomed" and "[m]otivated, cooperative, and polite" but had a "[d]ysphoric" mood and a flat affect. (*Id.*) He noted that she was fully oriented with normal thought processes and content and no evidence of hallucinations or delusions. (*Id.* at 329–30.) He observed that her insight was good and her judgment was normal. (*Id.* at 330.) He noted that her immediate, recent, and remote memory was within normal limits. (*Id.*) Mr. Legg observed that Claimant's concentration was "mildly deficient" but her persistence and pace were within normal limits. (*Id.*) He noted that her social functioning was within normal limits. (*Id.*) Mr. Legg diagnosed Claimant with severe, recurrent major depressive disorder without psychotic features and generalized anxiety disorder. (*Id.*)

3. *Opinion Evidence: Dr. Jessica Murphy, D.O.*

On June 1, 2016, Dr. Murphy, Claimant's primary care physician, completed a form about Claimant's mental impairments at the request of the state disability agency. (*Id.* at 326.) She noted that she prescribed Claimant two psychotropic medications. (*Id.*) She explained that she diagnosed Claimant with major depressive disorder and generalized anxiety disorder based on Claimant's inability to relax or concentrate, her feelings of nervousness and anxiety, her inability to stop worrying, her restlessness, and her irritability. (*Id.*) Dr. Murphy opined that Claimant's mental impairments resulted in "[d]ifficulty interacting with public" and "[f]earful[ness]." (*Id.*) However, she noted that she had not referred Claimant for mental health treatment. (*Id.*)

On April 25, 2018, Dr. Murphy completed a "Medical Questionnaire" for Claimant. (*Id.* at 509–13.) She explained that she treated Claimant "for ongoing [and] chronic problems associated with severe thyroid disease [and] chronic fatigue, causing mental functioning problems [and] inability to function in public." (*Id.* at 509.) She noted that Claimant had been diagnosed with several impairments, including "Major Depression," and she related that Claimant's medical conditions caused mental symptoms of fatigue, increased despair, sleep disturbance, and mood changes. (*Id.*) Dr. Murphy opined that Claimants conditions would cause her to be "off task" for more than 20% of a normal workday, explaining that she "cannot stay on task" and is "forgetful" with "Diminished Concentration." (*Id.* at 510.) Dr. Murphy also noted that Claimant has difficulty interacting with the public and opined that she would "Seldom" be able to "interact with the public while employed in a full time competitive work environment." (*Id.* at 511.)

When asked to rate Claimant's understanding and memory on a scale ranging from "none" to "extreme," Dr. Murphy opined that she had moderate limitations in her "ability to remember locations and work-like procedures," marked limitations in her "ability to understand and remember very short and simple instructions," and extreme limitations in her "ability to understand and remember detailed instructions." (*Id.*)

When asked to rate Claimant's sustained concentration and persistence on the same scale, Dr. Murphy opined that Claimant had marked limitations in her "ability to carry out very short and simple instructions," extreme limitations in her "ability to carry out detailed instructions," marked limitations in her "ability to maintain attention and concentration for extended periods," moderate limitations in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," marked limitations in her "ability to sustain an ordinary routine

without special supervision," extreme limitations in her "ability to work in coordination with or proximity to others without being distracted by them," marked limitations in her "ability to make simple work-related decisions," and extreme limitations in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods." (*Id.* at 511–12.)

When asked to rate Claimant's social interaction, Dr. Murphy opined that Claimant had extreme limitations in her "ability to interact appropriately with the general public," moderate limitations in her "ability to ask simple questions or request assistance," extreme limitations in her "ability to accept instructions and respond appropriately to criticism from supervisors," marked limitations in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and mild limitations in her "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (*Id.* at 512.)

Lastly, when asked to rate Claimant's adaptation, Dr. Murphy opined that Claimant had moderate limitations in her abilities "to respond appropriately to changes in the work setting" and "to be aware of normal hazards and take appropriate precautions," marked limitations in her abilities "to travel in unfamiliar places or use public transportation" and "to set realistic goals or make plans independently of others," and extreme limitations in her "ability to tolerate normal levels of stress." (*Id.* at 513.)

*C. Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant."  *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special

technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her

"not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision.  (Tr. at 26.)  She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability.  (*Id.*)  She found that Claimant's hypothyroidism, chronic fatigue syndrome, and osteoarthritis of the knees constituted "severe" impairments.  (*Id.*)  However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 30–31.)  Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except the [sic] can occasionally climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl" and "never climb ladders, ropes or scaffolds." (*Id.* at 31.)  She further found that Claimant "would need to avoid frequent exposure to extreme cold, heat, wetness, and humidity" and "avoid workplace hazards, such as moving machinery and unprotected heights." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was able to perform her past relevant work as an administrative clerk and an office clerk. (*Id.* at 33–34.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . from May 8, 2016, through the date of this decision." (*Id.* at 34.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations."  *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."  *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

At bottom, Claimant argues that the ALJ erred by concluding that her mental impairments are not severe.  (ECF No. 16 at 8–12.)  But her reasons for why that is so relate more to the weight the ALJ gave to various opinion evidence in the record.  (*Id.*)  Claimant asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ.  (*Id.* at 12.)  The Commissioner responds that the ALJ properly determined that Claimant's mental impairments are not severe and that the weight she gave to the opinions is supported by substantial evidence.  (ECF No. 17 at 5–7.)

To evaluate the severity of a claimant's mental impairments using the "special technique" prescribed by the regulations, the ALJ first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and

15

document [his] findings." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1520a(b)(1)).  Next, the ALJ must "rate [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 404.1520a(c)(2).  Specifically, the ALJ analyzes a claimant's functional limitations by assessing the claimant's abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  *Id.* § 404.1520a(c)(3).  If the claimant has no limitations or only mild limitations in these four areas, her "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [her] ability to do basic work activities."  *Id.* § 404.1520a(d)(1).

Here, the ALJ acknowledged that Claimant suffered from depression and anxiety and principally used psychotropic medications to treat them.  (Tr. at 26–27.)  She explained that Claimant's mental impairments "appear to be controlled with psychotropic medication, as multiple providers have documented her as having appropriate affect and a normal mood during her visits," and the treatment notes from her primary care physician, Dr. Murphy, "reflect that [her] anxiety is generally no more than mild."  (*Id.* at 27.)  The ALJ further reasoned that Claimant's depression and anxiety were not severe because she had never been hospitalized for psychiatric or psychological reasons, and she stopped going to therapy after only one month of treatment because "she did not think it was beneficial."  (*Id.*)

In applying the special technique, the ALJ determined that Claimant "has a mild limitation" in understanding, remembering, or applying information based on her providers' continual mental status findings that she had "a normal thought process and

thought content, normal judgment, good insight," and normal memory. (*Id.* at 28.) She determined that Claimant "has a mild limitation" in interacting with others because Claimant reported attending church and "that she gets along with her husband, son, half-siblings, and . . . she has several friends" and she was observed to have "normal social functioning" and "was cooperative with her medical examiners and she had an appropriate affect during her visits." (*Id.* at 28–29.) The ALJ also determined that Claimant "has a mild limitation" in concentrating, persisting, or maintaining pace based on her daily activities and objective findings that she had normal memory, persistence, and pace. (*Id.* at 29.) Finally, the ALJ concluded that Claimant "has a mild limitation" in adapting or managing herself because she "is able to shower daily, feed and take care of her three dogs, drive herself, mow her grass, sweep, mop, dust, do laundry, and attend her doctor appointment [sic]" and she was observed to be "appropriately dressed and groomed" and have a "neutral" mood and "appropriate" affect at her appointments. (*Id.*) Because the ALJ reasoned that Claimant's "medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas," she found that those impairments were not severe. (*Id.*)

The ALJ's analysis complies with the regulations: she evaluated Claimant's mental functioning in the four pertinent areas and cited to record evidence to explain her findings. *See Patterson*, 846 F.3d at 662 (explaining that 20 C.F.R. § 404.1520a requires the ALJ to "rate [the claimant's] four areas of functional limitation . . . according to the prescribed scale" and "explain how he reached his conclusions about the severity of the mental impairment"). But Claimant argues that the ALJ's determination that her mental impairments are not severe is at odds with the opinions of Dr. Murphy, Claimant's treating physician, consultative examiner Mr. Legg, and the state-agency psychological

consultant who addressed Claimant's application at the reconsideration level.  (ECF No. 16 at 8.)  She acknowledges that the ALJ largely relied on Mr. Legg's findings in her analysis but contends that the ALJ "mischaracterizes" them because Mr. Legg diagnosed her with "severe" depression and "noted that her mood was dysphoric and that her affect was flat."  (*Id*. at 9–10.)  Mr. Legg indeed made those findings in his mental status examination, but—as the ALJ explained when giving "great weight" to his opinions—he observed that her mental abilities were within normal limits, with the exception of her concentration, which was "mildly deficient."  (Tr. at 329–30; *see id*. at 33.)  In other words, Mr. Legg's findings indicate that Claimant's dysphoric mood and flat affect did not significantly reduce her mental functioning during the consultative examination.  (*See id*. at 329–30.)  This appears consistent with the ALJ's conclusions that Claimant's abilities to understand, remember, or apply information and to concentrate, persist, and maintain pace were mildly limited.  (*Id*. at 28–29.)  It is therefore unclear how the ALJ mischaracterized Mr. Legg's findings.  To the extent Claimant argues that the ALJ was required to conclude that her mental impairments are severe merely because Mr. Legg labeled her depression as such in his report, that argument is misplaced because his opinion does not supplant the ALJ's responsibility to apply the "special technique" to determine the severity of Claimant's mental impairments.  *See Huffman* ex rel. *Huffman v. Berryhill*, No. 2:16-cv-02594, 2017 WL 3097159, at *5 (S.D.W. Va. July 20, 2017) ("Only after evaluating the degree of functional limitation may the ALJ determine whether the mental impairment is a severe impairment." (citing 20 C.F.R. § 404.1520a(d))); *see also Patterson*, 846 F.3d at 662 (implying that failure to apply "special technique" is usually reversible error).

Turning to Claimant's contention that the ALJ improperly rejected the opinions of her primary care physician, Dr. Murphy, and the state-agency psychological consultant at the reconsideration level, when determining whether a claimant is disabled, the ALJ must "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam). A treating physician's opinion about a claimant's condition may be given "greater weight" than that of a non-treating physician "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.*

The ALJ accorded "little weight" to Dr. Murphy's opinions that Claimant has moderate, marked, and extreme limitations in mental functioning as "clearly inconsistent" with her representation that she never referred Claimant to specialized mental health treatment and her treatment records, which reflect largely normal mental status findings and improvement in symptoms with medication. (Tr. at 32.) This is a permissible reason to discount a treating physician's opinion. *Carter v. Saul*, No. 1:19-cv-00191, 2020 WL 3055465, at *18 (S.D.W. Va. Jan. 2, 2020) (citing *Dunn v. Colvin*, 607

F. App'x 264, 271 (4th Cir. 2015)), *adopted by* 2020 WL 1502860 (S.D.W. Va. Mar. 30, 2020). Moreover, "[a]n ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267 (internal citations omitted). Neither is true for the ALJ's treatment of Dr. Murphy's opinions.

The ALJ also gave "little weight" to the opinions of the state-agency psychological consultant at the reconsideration level that Claimant is "moderately limited in the [sic] dealing with the public and with co-workers." (Tr. at 33.) She contrasted those opinions with Claimant's representations to consultative examiner Mr. Legg that "she gets along with her husband, son, half-siblings, and that she has several friends" and her hearing testimony that she attended church. (*Id.*) Claimant argues that the ALJ's reasoning is "superficial and inconsistent with the evidence as a whole." (ECF No. 16 at 10.) She points to her hearing testimony that "she struggles dealing with people," the fact that she uses prescription medication to treat her mental impairments, and her reports of depression and anxiety symptoms "throughout the record." (*Id.* at 10–11.) As an initial matter, "the mere fact that [Claimant] was prescribed medication is not evidence that [her] mental impairments [are] severe." *Lester v. Colvin*, No. 1:13-cv-759, 2015 WL 1458139, at *6 (W.D.N.C. Mar. 30, 2015). In addition, "the ALJ is not required to unquestioningly 'accept all testimony given during the hearing as true,'" as it "is but one piece of evidence the ALJ must consider and does not conclusively establish the claimant's functional limitations." *Berry v. Saul*, No. 3:19-cv-00259, 2020 WL 1868769, at *11 (S.D.W. Va. Mar. 30, 2020), *adopted by* 2020 WL 1865849 (S.D.W. Va. Apr. 14, 2020).

Ultimately, the ALJ discounted the state-agency psychological consultant's opinions as "inconsistent with the claimant's testimony and medical records as a whole." (Tr. at 33.) She had already explained in determining that Claimant's ability to interact with others was mildly limited that Claimant's statements "that she cannot take being around many people" were contradicted by her "ability to attend church," consultative examiner Mr. Legg's observation "that she had a normal social functioning," her representations to Mr. Legg "that she gets along with her husband, son, half-siblings, and that she has several friends," and her treating providers' observations "that she was cooperative . . . and she had an appropriate affect during her visits." (*Id*. at 28–29.) The ALJ followed the same reasoning when rejecting the state-agency psychological consultant's opinions that Claimant was moderately limited in that area. (*Id*. at 33.) Despite acknowledging that it is the ALJ's prerogative to weigh conflicting evidence in this manner, Claimant nonetheless puzzlingly argues that the ALJ could not have reasonably disagreed with the state-agency psychological consultant at the reconsideration level. (*See* ECF No. 16 at 10–11.) But the ALJ explained her reasons for doing so and cited to substantial evidence in the record to support her conclusions. (Tr. at 33.) Nothing more is required. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009) ("[A]n ALJ may, under the regulations, assign no or little weight to a medical opinion . . . if he sufficiently explains his rationale and if the record supports his findings.").

In sum, the undersigned **FINDS** that the ALJ properly evaluated the medical opinions in this case and likewise properly concluded that Claimant's mental impairments are not severe.

*IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge.    Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.    Extension of this time period may be granted for good cause shown.    Copies of any objections shall be served on opposing parties and provided to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.    28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: August 26, 2020

Dwane L. Tinsley
United States Magistrate Judge